# UNITED STATES DISTRICT COURT
for the
Northern District of New York

| | |
|---|---|
| In the Matter of the Search of <br> *(Briefly describe the property to be searched or identify the person by name and address)* <br> ONE iPHONE 13, CURRENTLY LOCATED AT 127 N. WATER ST., OGDENSBURG, NEW YORK 13669 | ) ) ) Case No. 8:23-MJ-619 (ATB) ) ) ) |

U.S. DISTRICT COURT – N.D. OF N.Y.
FILED
Oct 27 - 2023
John M. Domurad, Clerk

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the Northern District of New York, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. §§ 1324(a)(1)(A)(ii) & (v)(I) | Bringing or Attempting to Bring in Aliens into the United States and Conspiracy to Do the Same |

The application is based on these facts:
Provide the facts here.

☒ Continued on the attached sheet.
☐ Delayed notice of ___days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Matthew T. Miller, U.S. Border Patrol Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone *(specify reliable electronic means)*.

Date: 10/27/2023

_____
*Judge's signature*

City and state: Syracuse, New York

Hon. Andrew T. Baxter, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: ONE iPHONE 13, CURRENTLY LOCATED AT 127 N. WATER ST., OGDENSBURG, NEW YORK 13669 | Case No. 8:23-MJ-619 (ATB) |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Mathew T. Miller, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.  I am a Border Patrol Agent (BPA) with the United States Department of Homeland Security (DHS), Bureau of Customs and Border Protection (CBP), United States Border Patrol (USBP), and assigned to the Ogdensburg Border Patrol Station. I have been a Border Patrol Agent since September 2008. My primary duty is to assist in the prevention of illicit trafficking of people and contraband between the official ports of entry. My authority to perform this mission is articulated in the Immigration and Nationality Act, sections 235 and 287, and Title 8 U.S.C. Section 1357. These bodies of law relate to, among other things, a Border Patrol Agents authority to interrogate any alien or person believed to be an alien, and to make an arrest of any alien who is entering or attempting to enter the United States in violation of the immigration laws. To enforce these laws, I have received training at the

Federal Law Enforcement Training Center in Artesia, New Mexico in Law, Operations, Firearms, Driving Techniques, and Physical Techniques.

3. I have investigated violations of the Immigration Nationality Act (INA), including illegal entry of aliens in violation of Title 8, United States Code, Section 1325 and the smuggling of aliens in violation of Title 8, United States Code, Section 1324. I have written and executed search warrants for electronic devices and have reviewed the evidence contained within. I have analyzed data and information from electronic devices and presented that data as evidence during criminal investigations.

4. I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

5. The applied-for warrant would authorize the forensic examination of the Device, as described herein and in Attachment A, for the purpose of identifying electronically stored data described in Attachment B. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of federal criminal laws, including Title 8, United States Code, Sections 1324(a)(1)(A)(ii) &(v)(I) (transporting or attempting to transport aliens and conspiracy to do the same)have been committed by Ruben Omar RAMOS-Portela and other as-yet unnamed . There is also probable cause to search the property described in Attachment A, for evidence of these crimes as described in Attachment B.

6. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7. As described further in Attachment A, the property to be search is: one iPhone 13 cellular phone IMEI: 352408238044258 (hereinafter "the Device"), which is currently located at 127 N. Water St., Ogdensburg, New York 13669.

8. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

9. On October 16, 2023, Wellesley Island Border Patrol Station relayed information regarding a suspicious vehicle to Swanton Sector Intelligence Units ("SIU"). Wellesley Island Border Patrol Station informed SIU that a 2017 Black Ram truck with Alabama registration 5AOCA13 (the "vehicle" or "Dodge Ram") was traveling northbound on Interstate 81 to U.S. Highway 11 where it continued northbound to Malone, New York. The vehicle had two occupants.

10. On the evening of October 16, 2023, the black Dodge Ram traveled onto State Route 122 north of Malone, New York and traveled eastbound for several miles. State Route 122 runs parallel to the United States/Canadian Border and offers access to several known crossing locations for human smuggling into the United States. The vehicle was observed by Border Patrol Agents ("BPAs") on S.R. 122 driving east. The vehicle turned around on S.R. 122 and traveled back west. Based on training and experience involving human smuggling in the area, BPAs believed the vehicle was performing a "dry run." The vehicle then traveled to a hotel in Malone, New York, (the "hotel") where it remained for the night.

11. On October 17, 2023, at approximately 5:45 A.M., Burke BPAs relayed to Burke Intelligence Agents that the vehicle was leaving the hotel traveling southbound on State Route 11B. Burke BPAs were unable to conduct a traffic stop on the vehicle due to a separate human smuggling event apprehended earlier. The Burke Border Patrol Station has seen a significant increase of human smuggling in the area with smugglers often using of out of state registered vehicles to pick up non-citizens illegally entering from Canada.

12. Later that day, BPAs received information from an Ogdensburg Intelligence Agent that the vehicle had just left the hotel in Malone and was headed towards the Ogdensburg Station's Area of Responsibility on State Route 11B. BPAs responded to intercept the vehicle.

13. In Canton, New York, the vehicle passed a Ogdensburg BPA, who was in a marked service vehicle, at the intersection of State Route 310 and U.S. Highway 11 traveling west on U.S. 11. U.S. Highway 11 is a commonly used smuggling route due to the fact that it is a main travel corridor between the U.S./Canada Border and the interior of the United States via Interstate 81. The Ogdensburg Station has experienced a significant increase in the apprehension of human smugglers on U.S. 11. The BPA turned around and was able to get behind the Dodge Ram to verify it was in fact the vehicle relayed from the Intel Agent. The BPA observed the vehicle on U.S. 11 in the lane of travel leading to Ogdensburg via State Route 68. The BPA observed the vehicle force its way in between cars just before the traffic light change in order to make the left turn to continue on U.S. 11 traveling south. The late lane change indicated to the BPA that the driver of the vehicle was not familiar with the route of travel intended. Once behind the Dodge Ram, the BPA could see multiple occupants in the vehicle. The driver of the vehicle would break often and fluctuate their speed.

4

14. Due to the BPA's observations and information received from Burke BPAs, the BPA stopped the Dodge Ram on U.S. 11 in Dekalb Junction, NY. A second Ogdensburg BPA backed up the stop.

15. The BPA could see there were four subjects in the vehicle. The BPA identified themself as a Border Patrol Agent and questioned the occupants as to their citizenship. The BPA determined that Ruben Omar RAMOS-Portela was a Mexican citizen who illegally entered the United States in May of 2023 and claimed to have his Notice to Appear immigration documents at his home in Alabama. RAMOS-Portela claimed he worked with the driver, Yosmer Alexander ATUESTA-Sulvaran as mechanics. The BPA determined that ATUESTA-Sulvaran was a Venezuelan Citizen who illegally entered the United States from Mexico near El Paso, Texas last month.

16. The BPA noticed that the two rear passengers, Jose Manuel ZARAGOZA-Ochoa and Alfonso TOCOHUA-Coxcahua ("rear passengers"), were soaked. The BPA also noticed TOCOHUA-Coxcahua was covered in burrs. Their appearance was consistent with other non-citizens who have been apprehended walking illegally from Canada into the United States.

17. RAMOS-Portela told the BPA that ZARGOZA-Ochoa was his cousin and the other three subjects in the car worked for him. RAMOS-Portela showed the BPA a Facebook marketplace ad for a truck for sale in New Hampshire and said that was the purpose of their trip. The BPA thought this was suspicious since New Hampshire was in the opposite direction from where they were traveling. ZARGOZA-Ochoa claimed he crossed legally and had immigration paperwork in Alabama.

18. TOCOHUA-Coxcahua this time replied he didn't know if he had entered legally or illegally.

19. The backup BPA spoke to the rear passengers separately and informed the first BPA that both rear passengers admitted they did not have any immigration documents and had crossed into the United States illegally on October 16, 2023 from Canada. The backup BPA observed both TOCOHUA-Coxcahua and ZARGOZA-Ochoa in wet clothing and covered in burrs. The backup BPA placed ZARGOZA-Ochoa and TOCOHUA-Coxcahua under arrest for illegally entering the United States. The Backup BPA placed RAMOS-Portela under arrest for alien smuggling. Upon arrest, the backup BPA seized the Device from RAMOS-Portela's person.

20. At this time, BPAs took all four individuals back to the station for further processing.

21. Interviews were conducted with all four subjects at the Ogdensburg Border Patrol Station. All subjects waived their *Miranda* Rights and were interviewed using language line services in the Spanish/English languages.

22. Jose Manuel ZARGOZA-Ochoa, told BPAs that he was Born in Mexico and was a citizen of Mexico. ZARGOZA-Ochoa stated that he flew from Mexico to Toronto, Ontario, Canada in 2023. ZARGOZA-Ochoa stated that he crossed the Canada/United States border illegally October 16, 2023 in the afternoon. ZARGOZA-Ochoa told agents that he and Alfonso TOCOHUA-Coxcahua were communicating with ATUESTA-Sulvaran and RAMOS-Portela using Whatsapp in order to navigate from Canada into the United States and then be transported away from the United States/Canadian Border. ZARGOZA-Ochoa stated his family was going to pay $5000 United States Dollars to ATUESTA-Sulvaran in exchange

for his transportation to Houston, Texas. ZARGOZA-Ochoa stated that half of that amount was already paid by his family to ATUESTA-Sulvaran. ZARGOZA-Ochoa told BPAs that he and another Mexican Citizen, TOCOHUA-Coxcahua, crossed the U.S./Canada border illegally and were planning on getting picked up by ATUESTA-Sulvaran and RAMOS-Portelaon the evening of October 16, 2023.

23. Alfonso TOCOHUA claimed he was a Mexican citizen born in Mexico. He stated that after crossing the United States/ Canada border illegally, he met ZARGOZA-Ochoa in the woods and waited with him for around eight hours. TOCOHUA-Coxcahua told agents that ATUESTA-Sulvuran had been sent money to bring him into the United States.

24. ATUESTA-Sulvaran, the driver of the Dodge Ram, stated he is a citizen of Venezuela and illegally entered the United States from Mexico in September 2023. ATUESTA-Sulvaran claimed that he and RAMOS-Portela left Alabama on October 15, 2023 in order to travel to New York to buy a truck. ATUESTA-Sulvaran told agents that when he woke up on the morning of October 17, 2023, there were two men in his hotel room that he did not know.

25. Omar RAMOS-Portela, the registered owner of the Dodge Ram who had been sitting in the front passenger seat, told BPAs that he was born in Mexico and is a Mexican Citizen. RAMOS-Portela claimed that he illegally entered the United States from Canada in May 2023. RAMOS-Portela stated he left Alabama on October 15, 2023 and drove with ATUESTA-Sulvaran to New York in order to buy a truck. RAMOS-Portela stated that he and ATUESTA-Sulvaran picked up two men at the hotel in Malone, New York and they intended to transport them to New York City and then drive back to Malone.

26. Based on my training and experience in this and other cross-border criminal investigations I have been involved with, including individuals entering the United States illegally, individuals crossing the border illegally will often communicate and coordinate with someone to pick them up once in the United States or to inform them that they successfully crossed the border via cellular telephone. Individuals involved in crossing the border illegally often use a cellular telephone's GPS function to search for and map out potential crossing and pickup locations and to navigate to such places. An additional function of cellular telephones that can be utilized by individuals crossing illegally includes the camera, as individuals will often take photos of where they are crossing the border illegally.

27. Additionally, alien smugglers often communicate with each other using cellular phones and downloaded applications to coordinate smuggling events. Smartphones, such as the Device, can also be used to access social media. Based on my training, knowledge, and experience of alien smuggling, I know that social media platforms, such as Facebook, are often used by smugglers to find customers and for communication between smugglers and aliens illegally entering the United States.

28. The Device is currently in the lawful possession of the United States Border Patrol and has been since October 17, 2023. As noted above, it came into Border Patrol's possession in the following way: seized incident to arrest. Therefore, while Border Patrol might already have all necessary authority to examine the Device, I seek this warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

29. The Device is currently being stored at 127 N. Water St., Ogdensburg, New York 13669. In my training and experience, I know that the Device has been stored in a

manner in which the contents are, to the extent material to this investigation, in substantially the same states as they were when the Device first came into the possession of Border Patrol.

## TECHNICAL TERMS

30. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   b. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

   c. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic films. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include

9

various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

d. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

e. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna

       can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

f. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

g. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text

messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

31. Based on my training, experience, and research, I know that cellular phones have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

32. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

33. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

34. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence

described by the warrant. The examination will be performed by representatives from the Department of Homeland Security and their designees.

35. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

36. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Mathew T. Miller
Border Patrol Agent
United States Border Patrol

I, the Honorable Andrew T. Baxter, United States Magistrate Judge, hereby acknowledge that this affidavit was attested to by the affiant by telephone on October 27, 2023 in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

Hon. Andrew T. Baxter
United States Magistrate Judge

## ATTACHMENT A

### Property to be Searched

The property to be searched is one iPhone 13 cellular phone IMEI: 352408238044258 (the "Device"). The Device is currently located at 127 N. Water St., Ogdensburg, New York 13669.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

### Particular Things to be Seized

1. All records on the Device described in Attachment A that relate to violations of Title 8, United States Code, Sections 1324(a)(1)(A)(ii) &(v)(I) (transporting or attempting to transport aliens and conspiracy to do the same) having been committed by Ruben RAMOS-Portela and other as-yet unidentified co-conspirators, including:

    a. Listings of incoming and outgoing calls with corresponding date/time of calls;

    b. Stored telephone and address directories;

    c. Direct connect and identification numbers;

    d. Pictures and videos;

    e. All audio recordings;

    f. All voice mail recordings;

    g. All location and GPS data;

    h. All instant messaging and related stored communications;

    i. All SMS messages and related stored communications; and,

    j. Any other notations or electronic storage of any kind.

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

    a. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.